# EXHIBIT B

**AGREEMENT**

between

CHROMALLOY NEW YORK

A DIVISION OF

CHROMALLOY GAS TURBINE LLC

330 BLAISDELL ROAD

ORANGEBURG, NEW YORK 10962


and the


INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL,

SALARIED, MACHINE AND FURNITURE WORKERS

AND COMMUNICATION WORKERS OF AMERICA

AFL-CIO


LOCAL 475 IUE-CWA

629 FIFTH AVENUE

PELHAM, NEW YORK 10803

**PRODUCTION AND MAINTENANCE**

September 19, 2018 – September 18, 2021

# TABLE OF CONTENTS

**Page**

Agreement ..................................................................................................................1

| | | |
|---|---|---|
| **Article 1** | **Fair Employment Practices** ...............................................1 | |
| | Section A – Federal Equal Pay Act Of 1963 ................................1 | |
| | Section B – Equal Employment Opportunity ................................1 | |
| | Section C – The Family And Medical Leave Act Of 1993 And The New York Paid Family Leave Law ("NYPFL")................1 | |

**Article 2**    **Coverage**..................................................................................2
  Section A – Employees Included ....................................................2
  Section B – Employees Excluded ...................................................2
  Section C – Work Performed By A Managerial Research & Development Personnel ....................................................2

**Article 3**    **Union Security**........................................................................3
  Section A – Recognition..................................................................3
  Section B – Union Membership Required........................................3
  Section C – Check-Off Of Initiation Fees, Dues And Assessments ...............3
  Section D – Shop Stewards..............................................................3
  Section E – Union Visitation ...........................................................4
  Section F – Bulletin Boards .............................................................4

**Article 4**    **Seniority** ..................................................................................4
  Section A – Seniority Defined .........................................................4
  Section B – Probationary Period ......................................................4
  Section C – Preferences Given For Seniority ..................................5
  Section D – Job Posting And Bidding ..............................................5
  Section E – Lay-Off Defined ...........................................................6
  Section F – Method Of Lay-Off .......................................................6
  Section G – Recall Defined ..............................................................6
  Section H – Method Of Recall .........................................................6
  Section I – Loss Of Seniority ...........................................................7
  Section J – Seniority Listing ............................................................7
  Section K – Return To The Bargaining Unit ...................................7

**Article 5**    **Rights of Employer to Manage** ............................................8
  Section A – General .........................................................................8
  Section B – Residual Rights .............................................................8

**Article 6**    **Hours and Overtime** ...............................................................8
  Section A – Work Week Defined ......................................................8
  Section B – Work Shift Defined .......................................................9
  Section C – Change Of Work Shifts And Work Hours.....................9
  Section D – Computation Of Overtime Pay .....................................9
  Section E – Notification Of Overtime ............................................10
  Section F – Required Overtime.......................................................10

# TABLE OF CONTENTS

**Page**

|  |  |  |
|---|---|---|
| | Section G – Call-In Pay And Call-Back Pay | 10 |
| | Section H – Prohibition Of Multiple Application Of Wage Rates | 10 |
| | Section I – 4th And 5th Shift Assignment | 10 |
| **Article 7** | **Paid Non-Working Time During Shifts** | **11** |
| **Article 8** | **Vacation** | **11** |
| | Section A – Vacation Benefits | 11 |
| | Section B – Partial Vacation Benefits | 12 |
| | Section C – Partial Prohibition Of Vacation Pay | 12 |
| | Section D – Vacation Carry-Over | 12 |
| | Section E – Pay For Vacation Benefits | 12 |
| | Section F – Holidays Occurring During Vacation | 13 |
| | Section G – Vacation Benefits On Termination | 13 |
| | Section H – Minimum Vacation Period | 13 |
| | Section I – Plant Shutdown | 13 |
| | Section J – Scheduling Vacation | 14 |
| **Article 9** | **Holidays** | **14** |
| | Section A – Holidays Designated | 14 |
| | Section B – Eligibility For Holiday Benefit | 15 |
| | Section C – Pay For Holiday Benefits | 15 |
| | Section D – Pay For Work Performed On A Holiday | 15 |
| | Section E – Prohibition Of Holiday Benefits For Employees On Lay-Off | 16 |
| | Section F – Holiday Schedule For 4th And 5th Shift Employees | 16 |
| **Article 10** | **Paid Sick Days** | **16** |
| | Section A – Sick Day Benefits And Eligibility | 16 |
| | Section B – Benefits And Eligibility For New Employees | 16 |
| | Section C – Pro-Rated Benefits On Lay-Off | 16 |
| | Section D – Paid Sick Days For 4th And 5th Shift Employees | 16 |
| **Article 11** | **Wages** | **17** |
| | Section A – Wage Benefits | 17 |
| | Section B – Wage Rates And Compensation For Probationary Employees | 17 |
| | Section C – Work In Higher Classification | 17 |
| | Section D – Shift Differential | 17 |
| | Section E – Merit Pay Increases | 18 |
| | Section F – Frequency Of Pay | 18 |
| **Article 12** | **Health, Welfare, Prescription and Dental Benefits** | **18** |
| **Article 13** | **Pension Benefits** | **20** |
| **Article 14** | **Grievance Procedure** | **21** |
| | Section A – Grievance Defined | 21 |

# TABLE OF CONTENTS

**Page**

Section B – Step One ..................................................................22
Section C – Step Two ..................................................................22
Section D – Step Three ...............................................................22
Section E – Step Four .................................................................23
Section F – Arbitration – Step Five .............................................23
Section G – Consequences Of Failing To Adhere To The Grievance
          Procedures ...................................................................24
Section H – Limitation On Authority Of Arbitrators ....................24
Section I – Right Of Representation And/Or Counsel For Parties Only .........24

**Article 15    Prohibition Against Strike, Slow-Down, Interruption of Business and
          Lock-Out** ...................................................................**25**
Section A – Strike Defined ..........................................................25
Section B – Prohibition Against Strike .........................................25
Section C – Lock-Out Defined .....................................................25
Section D – Prohibition Against Lock-Out ...................................26

**Article 16    General Provisions** ................................................................**26**
Section A – Jury Duty .................................................................26
Section B – Leave Of Absence ....................................................26
Section C – Leave Of Absence – Military Service .........................26
Section D – Prohibition Of Employment During Leave .................26
Section E – Bereavement Pay ......................................................26
Section F – Safety Committee, Safety Equipment And Sanctions .................27
Section G – Exclusive Recourse To Agreement ............................27
Section H – Check-Off Of Employee Deposits To Federal Credit
          Union .........................................................................28
Section I – Attendance Award Program ........................................28
Section J – Request For Transfer .................................................28
Section K – Employee Records ....................................................28
Section L – Educational Refund Assistance Program ....................28
Section M – Term Life Insurance ................................................29
Section N – Training ...................................................................29
Section O – Short Term Disability ...............................................29

**Article 17    Alcohol/Drug/Substance Abuse** ..........................................**29**

**Article 18    Effect of Termination** .........................................................**30**

**Article 19    Severability** ........................................................................**30**

**Article 20    Duration** .............................................................................**31**

**Appendix Production And Maintenance Unit** .........................................**32**

**Appendix** ................................................................................................**33**

iii

## AGREEMENT

This Agreement made and entered into on the 19th day of September, 2018 by and between the Chromalloy New York Division of Chromalloy Gas Turbine LLC, located on 330 Blaisdell Road, Orangeburg, New York, 10962, (the "Employer" or the "Company") and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers and Communication Workers of America AFL-CIO for, and on behalf of and in conjunction with, Local 475, IUE- CWA AFL-CIO, located on 629 Fifth Avenue, Pelham, New York, 10803 (the "Union") or their respective successors and assigns and acting herein on behalf of the employees of the Employer, now employed (the "Employees").

## ARTICLE 1
## FAIR EMPLOYMENT PRACTICES

**SECTION A –** FEDERAL EQUAL PAY ACT OF 1963

The Employer subscribes to and adopts as its policy, the provisions of the Federal Equal Pay Act of 1963, which prohibits discrimination based solely on sex with respect to pay for equal work, requiring equal skills, effort and responsibility, when such work is performed under similar working conditions.

**SECTION B –** EQUAL EMPLOYMENT OPPORTUNITY

The Company is an equal opportunity employer and as such, prohibits discrimination on the basis of any characteristic prohibited by applicable federal, state and local laws, including, without limitation, Title VII of the Federal Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Genetic Information Nondiscrimination Act of 2008, the New York State Human Rights Law, and the New York State Constitution, each as amended, which, collectively, prohibit discrimination in connection with an individual's employment on the basis of their race, color, religion, sex, sexual orientation, national origin, disability, genetics, military status, gender identity or expression, marital status or any other characteristic protected by federal, state or local laws.  This policy applies to all terms, conditions, and privileges of employment, including, without limitation, recruitment, assignment, training, compensation, benefits, promotion, demotion, separation of employment, layoff, as well as all other privileges, programs, and conditions of employment.

The Employer subscribes to and adopts the provision of the National Labor Relations Act of 1935, as amended, which prohibits discrimination with reference to employment because of Union membership or Union activity.

**SECTION C –** THE FAMILY AND MEDICAL LEAVE ACT OF 1993 AND THE NEW YORK
PAID FAMILY LEAVE LAW ("NYPFL")

The Employer subscribes to and adopts the provisions of the Family and Medical Leave Act of 1993 (the "FMLA") which provides up to twelve (12) weeks of unpaid leave per year to eligible employees.  Whenever any of the Sections of this Agreement provide benefits greater than the FMLA, the provisions of this Agreement shall govern.  In those Sections where the leave provided

in this Agreement is greater than the twelve (12) weeks maximum allowed under the FMLA, leave under this Agreement shall be deemed to be inclusive of the provisions of the FMLA.

The Employer shall comply with the requirements of the New York Paid Family Leave Law (the "NYPFL"), which generally provides eligible employees with eight to twelve (8-12) weeks of job-protected leave with partial wage replacement for employees to care for a family member with a serious health condition, to bond with a new child, or to spend time with family members called to active military service.  For the avoidance of doubt, wherever possible, leaves under the FMLA, the NYPFL, and any other leaves of absences under this Agreement, shall run concurrently to the greatest extent permitted by applicable law.

## ARTICLE 2
## COVERAGE

**SECTION A – <u>EMPLOYEES INCLUDED</u>**

The bargaining unit, which is the subject of this Agreement, comprises all Production and Maintenance employees employed by the Employer at its premises, located at 330 Blaisdell Road, Orangeburg, New York.

**SECTION B – <u>EMPLOYEES EXCLUDED</u>**

Excluded from this bargaining unit are all office, clerical, engineers, administrative, inspectors, laboratory technicians, salesmen, professional, research and development, prototype, watchmen and guards, and supervisory employees as defined by Section 2 of the National Labor Relations Act.

**SECTION C – <u>WORK PERFORMED BY A MANAGERIAL RESEARCH & DEVELOPMENT PERSONNEL</u>**

It is not the intention of the Employer to have managerial (foremen, supervisors, etc.) or research and development personnel perform bargaining unit work because that detracts from their assigned work, but to the extent that it is essential for the running of the business, such persons will perform bargaining unit work; provided, however, that such persons will not perform bargaining unit work during any period of layoff; and provided further that such persons will not perform bargaining unit work when the effect thereby is to deprive an overtime work opportunity to any bargaining unit employee who would otherwise have been entitled to such overtime work opportunity; except where such persons must perform bargaining unit work because of absenteeism, or such person must perform bargaining unit work when bargaining unit employees are performing non-bargaining unit work on experimental or developmental hardware and/or experimental or developmental equipment.

2

**ARTICLE 3**
**UNION SECURITY**

**SECTION A – RECOGNITION**

The Employer recognizes the Union as the sole and exclusive collective bargaining representative of every employee covered by this Agreement with respect to rates of pay, wages, hours of employment and other conditions of employment, as defined in the Labor Management Relations Act.

**SECTION B – UNION MEMBERSHIP REQUIRED**

1.      All employees who are members of the Union as of the signing of this Agreement shall remain members of the Union in good standing as a condition of continued employment with the Company.

2.      As a condition of continued employment with the Company, all production and maintenance employees shall be required to become and remain members of the Union in good standing not later than thirty (30) days after signing this Agreement or thirty (30) days after the date of hiring, as the case may be.

3.      Any employee who fails to meet the requirements of this Section, shall not be retained in the employ of the Employer, provided that the Union shall have notified the Employer and the employee of such default in writing and said employee shall have failed to remedy the same within ten (10) days after notice.

**SECTION C – CHECK-OFF OF INITIATION FEES, DUES AND ASSESSMENTS**

The Company shall: (i) deduct initiation fees after an employee's admission into the Union; and (ii) collect Union dues on the 15th day of every month, in arrears from the pay of each employee covered by this Agreement and promptly remit such dues on a monthly basis to the Union for and on behalf of said employees.

The Employer will not be obligated to make the foregoing deductions unless the Union furnishes the Employer with authorization cards signed by the individual employees.  The Union and each employee authorizing the assignment of wages for the payment of Union dues and initiation fees shall indemnify and hold the Employer harmless against all claims, suits or other forms of liability that shall arise against the Employer for, or on account of, any deduction made from the wages of such employee.

**SECTION D – SHOP STEWARDS**

The Employer recognizes the right of the Union to designate one (1) Shop Steward for each shift or one (1) Shop Steward for each fifty (50) employees who work on a shift, whose authority shall be limited to the investigation and presentation of grievances in accordance with Article 14 herein and other authorized Union business in accordance with the provisions of this Agreement.

Shop Stewards shall be permitted to spend not more than fifteen (15) minutes, twice per week, performing Union business; provided however, that any such Union business only shall be conducted either: (i) fifteen (15) minutes prior to the lunch period, or (ii) fifteen (15) minutes prior to the end of the Shop Steward's normal shift.  Shop Stewards must notify his Front Line Leader before leaving the workstation to conduct Union business.  Shop Stewards shall be compensated at their straight time hourly wage rate for time spent conducting Union business.  The Employer reserves the right, in its sole discretion, to discipline Shop Stewards who fail to comply with the requirements of this provision.

The Shop Steward on each shift, shall be the last to be laid off and the first to be recalled.

**SECTION E –** UNION VISITATION

Officers, or any authorized representatives of the Union, who are not employees, shall be permitted to visit the plant or operations of the Employer on proper Union business during working hours, subject to the Union or authorized representatives of the Union providing twenty-four (24) hours advance notice, except in emergency situations.  The Union representative will have admission by pass from the Employer.

**SECTION F –** BULLETIN BOARDS

The Employer shall provide a bulletin board in the plant for use by the Union.  Said bulletin board is to be used for posting notices of legitimate Union business.  The bulletin boards shall not be used for the purpose of posting any material which will reflect negatively or adversely on the Company, its actions or policies, and all such notices must be signed by an authorized representative of the Union.  The parties acknowledge that the Employer is not responsible for the creation, content or posting of any such notices.

## ARTICLE 4
## SENIORITY

**SECTION A –** SENIORITY DEFINED

Seniority shall be defined as an employee's continuous length of service with the Employer in the bargaining unit; provided however, that an employee shall not receive service credit for any leaves of absences of nine (9) months or more, with the exception that employees on a workers' compensation leave shall not receive service credit for any such leave of twelve (12) months or more.

Seniority will be measured from an employee's most recent date of hire.  In the event that two (2) or more employees have the same most recent date of hire as a full-time employee, their respective seniority shall be determined by alphabetical order of their last names.

**SECTION B –** PROBATIONARY PERIOD

A new employee will be on probation for up to three (3) calendar months.  Probation may be extended for an additional thirty (30) days upon notice by the Employer to the Union.  During the probationary period, an employee will be subject to discipline, up to and including discharge, at

4

the sole discretion of the Employer, and such action will not be subject to the grievance procedure in Article 14 of this Agreement.

During the probationary period, an employee will not be eligible for holidays, vacation or sick pay benefits. However, upon the completion of the probationary period the employee: 1) will receive pay for any holidays occurring during such probationary period, provided that such employee met the eligibility for holiday benefits contained in Article 9, Section B; 2) will be credited with accrued vacation benefits as per Article 8, Section B; and 3) will be credited with accrued sick leave benefits as per Article 10, Section B.

**SECTION C – <u>PREFERENCES GIVEN FOR SENIORITY</u>**

Preferences shall be given to employees as enumerated below, according to their seniority, provided that such employees are available at such time as the work is assigned and qualified to perform the work assigned. Employees in the order of seniority shall have preference.

1.      Bidding on posted job openings as defined in Section D herein.

2.      To available work opportunity in the event of a layoff as described in Section F herein.

3.      To available work opportunity in the event of a recall as described in Section H herein.

4.      In selection of vacations, subject to the approval of the Employer, which approval shall not be unreasonably withheld.

**SECTION D – <u>JOB POSTING AND BIDDING</u>**

1.      <u>Job Opening Defined</u>

A job opening is defined whenever the Employer needs an employee to perform a certain function, on a permanent assignment. It is within the sole discretion of the Employer, through its designated management personnel or agents to determine when a "need" arises and/or a "job opening" exists.

2.      <u>Posting and Bidding</u>

The purpose of a job posting and bidding is limited to permit regular full time employees to be upgraded in skill level and rate of pay. When the Employer determines that a job opening exists, it will be posted on the appropriate bulletin board for a period of three (3) work days, *i.e.* seventy-two (72) work hours. Regular full time employees desiring to bid on such job opening must do so by signing their name to the job posting.

In the event the Employer changes the job requirements for any particular job classification on a posting, the Employer will provide the Union with a copy of the revised posting fifteen (15) days prior to the position being posted. If a written test is required, the requirement and the passing grade will be enumerated on the posting.

EAST\166710285.1

3.     Qualification and Award of Jobs

The most qualified senior bidder will be awarded the job, provided that such employee can demonstrate during a qualification period not to exceed ninety (90) days that the employee is qualified to perform the job.  The determination of such qualification shall be made within the sole discretion of the Employer, and the Employer can make such determination anytime during such ninety (90) day qualification period.

## SECTION E – LAY-OFF DEFINED

A lay-off is defined as a reduction in the work force and such lay-off shall be in the sole discretion of the Employer.

## SECTION F – METHOD OF LAY-OFF

The Employer will determine the number of employees to be laid off and the classification(s) affected and communicate the same to the appropriate Union Steward at least five (5) working days prior to such lay-off.

1.     Lay-off shall be in reverse order of seniority, that is, the least senior employee in the classification(s) affected shall be laid off first.

2.     An employee subject to lay-off may displace employees with less seniority as follows:

a.     First, an employee shall have the right to displace the least senior employee in an equal or lower rated classification(s) in which he has previously been classified.

b.     If unable to exercise (a), then the right to displace the least senior employee in the classification of Production Worker.

3.     Notwithstanding the foregoing, employees hired as of September 19, 2016, shall not have any right to exercise their rights pursuant to this Article 4, Section F.  All other employees shall be grandfathered in and reserve the right to displace the least senior employee in the classification of Production Worker.

## SECTION G – RECALL DEFINED

Recall is defined as an increase in the work force, by job classification, after a previously effected lay-off.

## SECTION H – METHOD OF RECALL

Employees will be recalled to the job classification they held prior to the lay-off, in accordance with seniority, that is, the most senior employees will be recalled first.  Notice of such recall will be given as soon as practicable by a letter, Certified Mail, Return Receipt Requested, with a copy to the Union, to the address last given by such employee and proof of such notice will be placed in the personnel file of such employee.  Any employee subject to a recall must notify the Employer within two (2) working days of the date on which notification was delivered of the employee's

EAST\166710285.1

intent to return to work.  The employee shall have ten (10) working days to report to work from the date on which notification was delivered.  For purposes of this Section, delivery of any recall notice shall be deemed made as of the date stamped on the certified return receipt.  Failure to comply with such notice will preclude any claim for loss of work opportunity and will result in loss of seniority and recall rights pursuant to Section I herein.

**SECTION I** – <u>LOSS OF SENIORITY</u>

An employee will lose all rights of seniority if:

1.      Such employee voluntarily quits.

2.      Such employee is discharged for "just cause."  For purposes of this Agreement, "just cause" shall include, but is not limited to, engaging in workplace conduct that is prohibited or considered unacceptable under Chromalloy's Rules of Conduct Policy.

3.      Such employee fails to comply with Section H herein.

4.      Such employee is on a lay-off and is not recalled within a period of time equal to the lesser of: (i) twelve (12) months; or (ii) the employee's length of active service.

5.      Such employee fails to return on the appointed date from a leave of absence granted by the Employer, unless such employee has a reasonable excuse that is acceptable to the Employer.

6.      Such employee fails to report to work for three (3) consecutive work days, unless such employee has a reasonable excuse that is acceptable to the Employer.

7.      Such employee is on a leave of absence and does not return to work within nine (9) months from the commencement of any such leave or applies for long term disability, whichever is earlier; <u>provided, however</u>, that employees on worker's compensation leave shall lose all rights of seniority after (i) twelve (12) months of leave or (ii) the employee applies for long term disability, whichever is earlier.

8.      Such employee is subject to layoff, but waives in writing his recall and seniority rights with the Union or the Employer.

**SECTION J** – <u>SENIORITY LISTING</u>

The Employer will furnish the Union with a copy of the seniority list on the execution of this Agreement and will inform the Union of any changes, in writing, within fifteen (15) days at the end of each calendar quarter.

**SECTION K** – <u>RETURN TO THE BARGAINING UNIT</u>

An employee who is promoted to, or otherwise obtains, a position with the employer outside of the bargaining unit, shall retain his bargaining unit seniority for a period of no more than ninety (90) calendar days; thereafter, such employee shall lose his seniority.

EAST\166710285.1

# ARTICLE 5
# RIGHTS OF EMPLOYER TO MANAGE

**SECTION A –** GENERAL

The Employer has the complete legal responsibility, except as expressly and specifically limited in this Agreement, and the right to manage and control its business, efficiently and economically, including, but not limited to, the right to:

1.     Hire, transfer, promote, demote, discipline, and discharge employees for "just cause" (as defined in Article 4) and assign, schedule and direct employees in their work;

2.     Determine whether to expand, reduce or eliminate, on a temporary or permanent basis the work force;

3.     Determine the requirements for every job in the bargaining unit and to revise same including any new job;

4.     Determine the rate of pay for any new job;

5.     Make or revise and enforce personnel policies and work rules and regulations;

6.     Determine, schedule and control (i) products, services, and work production; (ii) work in production, methods, means, quantity and quality of products and services, (iii) the marketing and sales of all products and services and (iv) the acquisition, installation, operation, maintenance, alteration, retirement, and removal of equipment and facilities;

7.     Discontinue any portion of the business, in whole or in part; and

8.     Subcontract the work of the bargaining unit; control all property, equipment and facilities and the manner and extent of their use.

Consistent with this Agreement and applicable law, the Employer may take whatever action(s) may be necessary to carry out its rights in any emergency situation.

**SECTION B –** RESIDUAL RIGHTS

The Employer reserves, all the rights of management, except as limited by the terms and conditions of this Agreement.

# ARTICLE 6
# HOURS AND OVERTIME

**SECTION A –** WORK WEEK DEFINED

The regular work week commences at 10:45 PM on Sunday, when the third shift begins work.  The regular work week ends at 11:00 PM on Friday at the end of the second shift.

EAST\166710285.1

The Employer shall have the right to establish a weekend shift consisting of a 36-hour work week, commencing at 7:00 AM Friday, when the fourth shift begins work.  The weekend work week ends at 7:00 AM on Monday.

## SECTION B – WORK SHIFT DEFINED

The Union agrees to an eight and a half (8 ½) hour standard work day, with a half (½) hour unpaid period for lunch.  The work shifts shall be defined as follows:

1.  First Shift - The first shift will commence work at 6:45 AM and will end work at 3:15 PM, with a half (½) hour unpaid lunch from 12:00 PM to 12:30 PM.

2.  Second Shift - The second shift will commence work at 2:45 PM and end work at 11:15 PM, with a half (½) hour unpaid lunch from 7:00 PM to 7:30 PM.

3.  Third Shift - The third shift will commence work at 10:45 PM and end work at 7:15 AM, with a half (½) hour unpaid lunch from 4:00 AM to 4:30AM.

4.  Fourth Shift - The 4th shift will commence work at 7:00 AM and end work at 7:00 PM.

5.  Fifth Shift - The 5th shift will commence work at 7:00 PM and end work at 7:00 AM.

## SECTION C – CHANGE OF WORK SHIFTS AND WORK HOURS

The work shifts and work hours specified hereinabove in Section B shall be subject to change upon mutual agreement; individual and group rearrangements shall be changed at the sole discretion of the Employer, provided that the Employer notifies the Union and affected employees three (3) days prior to said change.

## SECTION D – COMPUTATION OF OVERTIME PAY

Overtime and the computation of overtime pay, shall be governed by the following provisions:

1.  Overtime shall be calculated based on a forty (40) hour work week. As such, employees who perform work at the request of the Employer in excess of forty (40) hours in any given work week shall be compensated at one and one-half (1 ½) times the employee's regular straight time rate.  All overtime work must be authorized and preapproved by the Employer.

2.  The Employer shall not reduce an employee's regularly scheduled work week, subject to the terms of other provisions of the Agreement, including but not limited to plant shutdowns.

3.  Paid holidays, paid time off, vacation and sick leave hours shall be counted as hours worked for purposes of determining eligibility for overtime.

4.  All work performed on Sunday, holidays and any and all hours worked after eight (8) hours on Saturday shall be paid for at double the employee's regular straight time rate.

**SECTION E –** <u>NOTIFICATION OF OVERTIME</u>

Employees required to work overtime on their shift during their regular work week shall be notified at least two (2) hours before quitting time.  Employees requested to work on Saturday, Sundays, or the holidays hereinafter designated shall be notified at least twenty-four (24) hours in advance of such Saturday, Sunday or holiday work except in case of emergency.

**SECTION F –** <u>REQUIRED OVERTIME</u>

All bargaining unit employees may be required to work a reasonable amount of overtime and the assignment of all overtime will be within the sole discretion of the Employer and will be allocated as equally as possible by department and classification among employees on each shift.

**SECTION G –** <u>CALL-IN PAY AND CALL-BACK PAY</u>

1.     Any employee reporting for work who is sent home due to a lack of work, shall receive a minimum of six (6) hours pay, except for Coat & Heat Treat Specialists, Hydrogen Heat Treat, and HF/Autoclave Operators who will receive four (4) hours pay at the employee's regular straight time wage rate, unless notified the previous day not to report to work.

2.     Employees who have left the plant and who are called in to work outside of their regular schedule shall be guaranteed at least six (6) hours work with pay one and one-half (1-1/2) times their straight time hourly rate.

**SECTION H –** <u>PROHIBITION OF MULTIPLE APPLICATION OF WAGE RATES</u>

When two (2) or more types of premium compensation apply to the same hours of work, only the higher rate of compensation shall be paid.  There shall be no pyramiding or duplication of such compensation.

**SECTION I –** <u>4TH AND 5TH SHIFT ASSIGNMENT</u>

It is not the intent of the Employer to eliminate overtime from the plant by establishing these shifts.

After the Employer has determined the number of employees and the job classification required for these shifts, the Employer will be guided by the following:

- Voluntarily recall employees in accordance with their seniority; however, the employees will not lose their recall rights if they choose not to accept the 4th or 5th shift assignment.  If sufficient persons are not available, then:

- Ask for volunteers from existing job classifications.  If sufficient persons are not available, then:

- Post for vacancies through the Posting and Bidding system, if sufficient persons are not available, then:

- Hire directly onto the 4th and 5th shifts and train as required.

The Employer will have the right to employ no more that fifteen (15) people onto each of the fourth and fifth shifts.  In the event the Employer runs a fourth shift only, the Employer will employ no more than twenty-five (25) people on the fourth shift.  The Employer will be limited to a total of ten (10) classifications in each of the fourth and/or fifth shifts.

The Employer will not mandate that any current employee be transferred onto the 4th and 5th shifts to fill manning requirements.  However, employees hired after September 1, 2004, may be hired on condition that they can be assigned to the fourth and fifth shifts as needed.

If the event of a layoff of employees, the Employer will not mandate that employees hired prior to September 1, 2004, be transferred to the 4th and 5th shifts in order to fill the requirements of those shifts.

## ARTICLE 7
## PAID NON-WORKING TIME DURING SHIFTS

1.  <u>Meal Periods</u> - An unpaid meal period consisting of thirty (30) minutes shall be provided during each work shift as set forth in Article 5, Section B.  Employees required to work more than four (4) hours of overtime on their shift shall be provided an additional unpaid meal break of thirty (30) minutes to be taken immediately after the first four (4) hours of overtime are worked.

2.  <u>Rest Periods</u> - There shall be one paid ten (10) minute rest period.  During any such rest period, employees shall be compensated at their regular rate of pay; provided, however, that paid breaks not taken cannot be accumulated or used to extend another break or leave early.  Rest periods of the three shifts shall be as follows:

    | | | |
    |---|---|---|
    | Third Shift | – | 2:00 AM - 2:10 AM |
    | First Shift | – | 9:00 AM - 9:10 AM |
    | Second Shift | – | 9:00 PM - 9:10 PM |

    Anyone required to work one (1) or more hours at the end of his normal shift (*i.e.*, work at least one (1) hour beyond the employee's standard work day), will be given a ten (10) minute paid rest period after the completion of the eighth scheduled hour.

3.  <u>Check Cashing Period</u> – Effective January 1, 2019, the fifteen (15) minute check cashing period shall be eliminated.

## ARTICLE 8
## VACATION

**SECTION A – <u>VACATION BENEFITS</u>**

Employees accrue vacation hours on a pro-rata basis, in arrears.  Vacation benefits are earned during the twelve (12) months between June 1 and May 31.  Any vacation benefits earned during the prior June 1 to May 31 period may be taken in the next succeeding twelve (12) month June 1

11

to May 31 period.  Employees are eligible to earn vacation time in accordance with the following schedule:

1.      Employees with less than twenty-four (24) months of continuous service as of June 1 can accrue, on a pro-rata basis, no more than five (5) work days of vacation.

2.      Employees having twenty-four (24) months of continuous service as of June 1 will be eligible for up to ten (10) work days paid vacation.

3.      Employees having five (5) years of continuous service as of June 1 will be eligible for up to fifteen (15) work days paid vacation.

4.      Employees having fifteen (15) years of continuous service as of June 1 will be eligible for up to four (4) work weeks paid vacation.

5.      Employees having twenty (20) years of continuous service as of June 1 will be eligible for up to five (5) work weeks paid vacation.

Time lost by an employee because of illness, FMLA leave, or compensable injury shall be credited as time worked for the sole purpose of vacation benefits.  Credit for such leaves shall be capped at three (3) months.

**SECTION B –** PARTIAL VACATION BENEFITS

Any employee, who on June 1, earned less than five (5) work days of paid vacation in the prior twelve (12) months period can, at the sole discretion of the Employer, a) receive pay only at the three and one-third (3-1/3) hours per month, provided that such payment will be deferred if the probationary period has not been completed or, b) will be permitted time off for the portion of the vacation pay earned, provided that the probationary period has been completed.

**SECTION C –** PARTIAL PROHIBITION OF VACATION PAY

Vacation pay in lieu of time off will only be permitted with the written permission of the Employer

**SECTION D –** VACATION CARRY-OVER

An employee shall be permitted to carry over no more than five (5) days of accrued, unused vacation time through and until May 31st of the following year.  Any such carried over time not used by May 31, shall not be paid out and shall be forfeited.

**SECTION E –** PAY FOR VACATION BENEFITS

Pay for a work week of vacation benefit shall be equal to forty (40) times the straight time hourly wage rate, plus any shift differential in effect at the time the vacation is taken, or when pay is received in lieu of time off, pursuant to Section C herein.

Pay for a day of vacation benefits shall be a sum equal to eight (8) times the straight time hourly wage rate, plus any shift differential in effect at the time the vacation day is taken, or when pay is received in lieu of time off, pursuant to Section C herein.

Pay for a day of vacation benefits for employees on the 4th and 5th shifts shall be a sum equal to 13.3 times straight hourly wage rate, plus any shift differential in effect at the time the vacation day is taken, or when pay is received in lieu of time off, pursuant to Section C herein.

Pay for vacation benefits will be processed during the normal pay cycle.

**SECTION F – HOLIDAYS OCCURRING DURING VACATION**

When a holiday occurs during a vacation period an additional day of vacation shall be granted with pay, in lieu of such holiday benefit.

**SECTION G – VACATION BENEFITS ON TERMINATION**

If an employee resigns, or is discharged or otherwise is terminated, any vacation benefits accrued and unused in the prior year, but not yet taken, will be paid in full.

Notwithstanding the foregoing, an employee who is terminated for "just cause," (as defined in Article 4), or who resigns employment without having provided at least one (1) week advance notice in writing, shall forfeit entitlement to, and shall not be paid any, accrued, unused vacation time, which may have existed as of the date of termination.

**SECTION H – MINIMUM VACATION PERIOD**

The vacation benefits under Section A herein shall be taken in minimum periods of one work week. However, employees will be allowed to take individual days of vacation up to a maximum of ten (10) vacation days in any vacation year.  Employees who take individual days of vacation must notify the Employer, in writing, at least two (2) work days prior to the requested day off.

**SECTION I – PLANT SHUTDOWN**

The Employer shall have the right to two (2) plant shut down periods, as follows:

1. The Employer shall have the right to shut down for the July 4th holiday week (for no more than four (4) days), with notice to be given to the Union no later than June 1st.

2. The Employer shall have the right to shut down for either the Thanksgiving or year-end holidays, as follows:

    a. For the Thanksgiving holiday week, no more than three (3) days, with notice to be given to the Union no later than October 1st; or

    b. For the 2019 year-end holiday, shut down from December 20th, up to January 3rd, with notice to be given to the Union no later than November 20th;

c.      For 2020 year-end holiday: shut down from December 20th, up to January 4, with notice to be given to the Union no later than November 20th; and

d.      All year-end holiday shut downs shall be no more than five (5) days.

On the regular work days that the plant is closed, employees will have the option of taking either an individual vacation day, a personal holiday, a sick/personal day, or will have the option of not being paid for the day.  In the event an employee does not have available either vacation days or a personal holiday, and they take a sick day, which would thereby disqualify them from receiving the annual attendance award of $200, they will not be disqualified for such award.  No employee will be declared ineligible for holiday pay on any of the scheduled holidays during the shutdown period because they opted for or did not get paid for the day (s) of shutdown.  Employees will not be allowed to take an advance against the next year's sick time allowance.

**SECTION J – SCHEDULING VACATION**

Vacation to be scheduled within various departments are subject to the approval of the Employer, by seniority, to the extent that production requirements and operating efficiency permit.

Employees shall submit their vacation preference between March 1 and April 1 and approved vacations will be posted by April 30 of each year.  Employees who do not indicate their preference on or before April 1 may submit vacation requests at a later time during the vacation year and will receive a response within two (2) weeks from the date of the request or on May 1, whichever is later.  Such employees will not be allowed to bump any employee who has selected his/her vacation during the March 1 to April 1 period or any other approved vacation.

Vacation schedules for all departments will be posted and will be updated bi-weekly.

## ARTICLE 9
## HOLIDAYS

**SECTION A – HOLIDAYS DESIGNATED**

The following days have been designated as the 2018 through 2021 holidays.  Holidays falling on a Monday through Friday shall be celebrated and paid for on the dates indicated below and holidays falling on a Saturday or Sunday shall be celebrated and paid for on a Monday through Friday as determined by the Union and the Company as follows:

|  | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| New Year's Day |  | Jan 1 Tue | Jan 1 Wed | Jan 1 Fri |
| Washington's B'day |  | Feb 18 Mon | Feb 17 Mon | Feb 15 Mon |
| Good Friday |  | Apr 19 Fri | Apr 10 Fri | Apr 2 Fri |
| Memorial Day |  | May 27, Mon | May 25 Mon | May 31 Mon |

14

|  | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Independence Day |  | Jul 4 Thu | Jul 3 Fri | Jul 5 Mon |
| Labor Day | Sep 3 Mon | Sep 2 Mon | Sep 7 Mon | Sep 6 Mon |
| Thanksgiving Day | Nov 22 Thur | Nov 28 Thur | Nov 26 Thur |  |
| Day after Thanksgiving | Nov 23 Fri | Nov 29 Fri | Nov 27 Fri |  |
| Day before Christmas | Dec 24 Mon | Dec 24 Tue | Dec 24 Thu |  |
| Christmas Day | Dec 25 Tue | Dec 25 Wed | Dec 25 Fri |  |
| New Year's Eve | Dec 31 Mon | Dec 31 Tue | Dec 31 Thu |  |

On September 1st of each year, regular full time employees shall be granted two (2) floating holidays to be used on either Dr. Martin Luther King's birthday, Veterans Day, the employee's actual birthday, or as personal holidays.

Third shift employees holidays may be moved to meet the production needs of the Company and the desires of employees on the following dates: July Fourth, Christmas Day, and New Years' Day holidays.  Third shift employees would not work on those nights.  The Good Friday holiday for the third shift will be shifted with Easter Sunday night.

**SECTION B – ELIGIBILITY FOR HOLIDAY BENEFIT**

Regular employees will be eligible for holiday benefits provided that they have worked on the scheduled full work day immediately preceding the actual holiday, the full holiday when scheduled, and agreed to by the subject employee, and the scheduled full work day immediately following the holiday, unless such employee is absent on any such days for a reason that is acceptable to the Employer.

**SECTION C – PAY FOR HOLIDAY BENEFITS**

A sum equal to eight (8) times the straight time hourly wage rate will be paid for each of the holidays designated in Section A herein.  Employees on the 4th and 5th shifts will be paid a sum equal to thirteen point three (13.3) times the straight time hourly wage rate for each of the holidays on which the Employer has designated a weekend holiday for the 36-hour workweek.

**SECTION D – PAY FOR WORK PERFORMED ON A HOLIDAY**

A sum equal to two (2) times the straight time hourly wage rate will be paid for all hours worked on any of the holidays designated in Section A herein, in addition to the payment provided for in Section C herein.  Employees on the 4th and 5th shifts shall be paid a sum equal to two (2) times straight time hourly wage rate, for all hours worked on any of the holidays on which the Employer has designated a weekend holiday for the 36-hour workweek, in addition to the payment provided for in Section "C" herein.

EAST\166710285.1

**SECTION E – <u>PROHIBITION OF HOLIDAY BENEFITS FOR EMPLOYEES ON LAY-OFF</u>**

Any regular employee otherwise entitled to holiday pay who may have been laid off not more than fifteen (15) days prior to the holiday, shall receive his full holiday pay.

**SECTION F – <u>HOLIDAY SCHEDULE FOR 4<u>TH</u> AND 5<u>TH</u> SHIFT EMPLOYEES</u>**

Employees on the 4th and 5th shifts shall have a holiday schedule compromised of eight (8) days on which employees are paid 13.3 hours each. The plant will only be closed on those specific dates on which the Employer has decided to cease operations. The plant will normally be closed on six (6) 4th and 5th shift holidays. The remaining two (2) holidays will be considered floating holidays that can be scheduled by the employee. The Employer will publish a list of holidays on which the 4th and 5th shifts will not work, on November 1st of each year, for the holidays scheduled for the next calendar year.

**<u>ARTICLE 10</u>**
**<u>PAID SICK DAYS</u>**

**SECTION A – <u>SICK DAY BENEFITS AND ELIGIBILITY</u>**

It is agreed that all employees with one year or more of service in the employ of the Employer shall be entitled to sick leave with pay at eight (8) times the straight time hourly wage rate in effect at the time the sick day is taken up to a maximum of eight (8) working days per year. Paid sick days are accrued at the rate of five and one third (5-1/3) hours for each month of service, provided that no paid sick days shall be granted during the first three (3) months of service as provided for in Article 4, Section B, and provided further that at no time shall any paid sick days be taken that have not been actually earned.

**SECTION B – <u>BENEFITS AND ELIGIBILITY FOR NEW EMPLOYEES</u>**

New employees hired before January 1st will accrue sick leave benefits at the rate of five and one third (5-1/3) hours per month. All employees become eligible to use accrued sick leave benefits after the January 1st following such year of accrual. Unused sick leave benefits will be paid on the first regular pay day in January of each year at the applicable straight time hourly wage rate.

**SECTION C – <u>PRO-RATED BENEFITS ON LAY-OFF</u>**

Employees who are laid off before the end of the fiscal year shall receive their pro-rated sick leave pay.

**SECTION D – <u>PAID SICK DAYS FOR 4<u>TH</u> AND 5<u>TH</u> SHIFT EMPLOYEES</u>**

Employees assigned to the 4th and 5th shifts will be entitled to sixty-four (64) hours of sick pay, which equates to five (5) regularly scheduled work days, plus shift differential. In the event an employee takes off on either Friday, Saturday or Sunday, he will be paid 13.3 hours for each sick day, which will be deducted from the total five (5) day entitlement.

**ARTICLE 11**
**WAGES**

**SECTION A – WAGE BENEFITS**

1.  <u>First Year</u> - Effective September 19, 2018 there will be an increase of three percent (3%) in the straight time hourly wage rate for each job classification as outlined in the Appendix. Employees having such job classification shall be granted said increase.

2.  <u>Second Year</u> - Effective September 19, 2019 there will be an increase of two and one half percent (2.5%) in the straight time hourly wage rate for each job classification as outlined in the Appendix.  Employees having such job classification shall be granted said increase.

3.  <u>Third Year</u> - Effective September 19, 2020 there will be an increase of three percent (3%) in the straight time hourly wage rate for each job classification as outlined in the Appendix. Employees having such job classification shall be granted said increase.

4.  During the term of this Agreement, lead persons will receive twenty-five cents ($.25) in excess of the straight time hourly wage rate as contained in the Appendix; provided however, that lead persons must meet and maintain the necessary qualifications as determined by the Company in its sole discretion.

5.  During the term of this Agreement, the Employer shall engage in a seniority-based bid process whereby all Maintenance classifications (no more than two (2) for the first shift, and two (2) for the second shift) shall have the ability to bid to perform waste water maintenance duties.  Successful bidder(s) shall receive $1.00 in excess of their straight time hourly wage rate.

**SECTION B – WAGE RATES AND COMPENSATION FOR PROBATIONARY EMPLOYEES**

The Employer shall, in its sole discretion, establish and alter the wage rates of all probationary employees.

**SECTION C – WORK IN HIGHER CLASSIFICATION**

If an employee is assigned to work in a lower classification, he shall nevertheless continue to receive his higher rate of pay.  If such employee is assigned to a higher-rated classification, he shall receive the higher rate on a day in which he works one or more hours in such higher-rated job and shall receive such higher rate for all hours worked in such higher classification.

**SECTION D – SHIFT DIFFERENTIAL**

Any employee working on the second shift shall receive a shift differential of ten percent (10%) higher than the regular straight time rate.  Any employee working on the third shift shall receive a shift differential of fifteen percent (15%) higher than the straight time rate.  The appropriate shift differential shall be paid to such employees for holiday pay, vacation pay and sick leave pay.  Any

employee working on the 5th shift shall receive a shift differential of 5% higher than the straight time rate.

**SECTION E –** MERIT PAY INCREASES

The Employer, in its sole discretion, may unilaterally award increases in pay based upon meritorious performance of an employee or other business related factors; and the Employer, in its sole discretion, may unilaterally revoke any such merit increases.

**SECTION F –** FREQUENCY OF PAY

Effective January 1, 2019, all employees shall be paid on a bi-weekly basis, every other Friday. The Employer strongly recommends that paychecks be direct deposited into an account at a financial institution of the employees' choice.

**ARTICLE 12**
**HEALTH, WELFARE, PRESCRIPTION AND DENTAL BENEFITS**

1.   The Employer will be obligated to make contributions to the Local 475 IUE-AFL-CIO Health and Welfare Fund as follows:

| Effective 9/19/2018 | Employee Only | $1,004.47 |
| | Employee and Dependents | $1,960.21 |
| Effective 9/19/2019 | Employee Only | $1,065.01 |
| | Employee and Dependents | $2,078.85 |
| Effective 9/19/2020 | Employee Only | $1,128.04 |
| | Employee and Dependents | $2,202.35 |

2.   The Employer shall not be required to pay any amounts to the Health and Welfare Plan beyond those specified in paragraph 1 above if the Health and Welfare Fund does not remain solvent or have enough money to cover expenses and debts.

3.   In addition to maintaining active employment, to be eligible for coverage in accordance with the provisions hereof, each employee will be required to contribute through payroll deductions the following bi-weekly amounts:

| Effective 9/19/2018 | Employee Only | $96.51 |
| | Employee and Dependents | $188.55 |
| Effective 9/19/2019 | Employee Only | $106.10 |
| | Employee and Dependents | $207.50 |
| Effective 9/19/2020 | Employee Only | $115.92 |
| | Employee and Dependents | $226.90 |

18

Contributions collected for pay periods prior to January 1, 2019, shall be on a weekly basis. Beginning the first pay period of January 2019, contributions shall be collected bi-weekly and on a pre-tax basis.

The Employer shall have no obligation to make contributions pursuant to this Article on behalf of any employee who fails to make contributions required under this Article.

The Employer shall have no obligation to make contributions on behalf of dependent(s) of employees for any calendar month that the dependent (s) are not covered under the Health and Welfare Plan.

The Employer shall have no obligation to make contributions on behalf of part-time/temporary employees, nor individuals who are already covered in the Health and Welfare Plan under another family member.

Employees may elect not to participate in the Health and Welfare Plan provided they have other medical coverage and the Employer shall have no obligation to make contributions on behalf of any employee who does not participate in the Health and Welfare Plan. Employees may elect not to participate in the Health and Welfare Plan during the initial enrollment and once each year thereafter by providing written notice to the Health and Welfare Plan at least thirty (30) days prior to the open enrollment period.

4.  Payments shall be made to the Health and Welfare Plan monthly on or before the fifteenth (15th) day of each month, in accordance with the provisions thereof, and continue for each employee eligible for coverage in accordance with the provisions thereof and who is actively on the payroll on the first day of the month.

5.  For each employee who ceases active employment due to personal illness or injury, the Employer shall continue to make payments to the Health and Welfare Plan, as though such employee were actively at work for a period of up to twelve (12) calendar months following cessation of active employment, provided the employee maintains a leave of absence under Article 16, Section B and that employee makes employee contributions set forth in Article 12, paragraph 3.

6.  For each employee who ceases active employment due to occupational injury or illness, the Employer shall continue to make payments to the Health and Welfare Plan, as though such employee were actively at work, for a period of up to twelve (12) calendar months following cessation of active employment, provided the employee maintains a level of absence under Article 16, Section B and that employee makes employee contributions set forth in Article 12, paragraph 3.

7.  In no event will the Employer be obligated to pay two (2) premiums for married employees. In such case, only one premium payment is required for both employees.

8.  Health benefits provided by the Health and Welfare Plan shall meet the following minimum guidelines for in-network benefits only:

    - Office co-pay not to exceed $50 per visit

19

- Hospitalization co-pay not to exceed $600 per confinement
- Emergency Room co-pay not to exceed $200
- Lab and diagnostic testing co-pay not to exceed $75
- Surgery co-pay not to exceed $200
- Two-tiered prescription plan not to exceed $20 co-pay for generic and $60 copay for brand
- No deductible for in network and $7,500/$15,000 for out of network
- Stop Loss insurance
- Employer may re-open the contract for the medical benefit clause only if the benefits do not meet any of the above minimum standards.

9.   During the life of this Agreement, if state or federal legislation is enacted that regulates medical insurance programs such as those provided under this Agreement, the Employer and/or Union shall have the discretion to re-open the contract for the medical benefit clause only at the time the state or federal legislation is enacted.

## ARTICLE 13
## PENSION BENEFITS

The Union represents that by an agreement and declaration of trust made as of the 7th day of April, 1965, between Local 475 of the International Union of Electrical, Radio and Machine Workers, AFL-CIO, and various employers who are or may become parties thereto, a trust fund designated as the "Local 475 IUE-CWA AFL-CIO Pension Plan," ("Pension Plan") was established to provide retirement benefits from contributions to the Pension Plan.

The parties agree that said trust fund shall be approved under the Internal Revenue Code of 1954, and under the Labor Management Relations Act of 1947 as amended.

The Employer will contribute the amount set forth below per hour for each employee covered by this Agreement for each hour which said employee receives pay, provided, however, that the Pension Plan is administered so as not to create "vested unfunded liability" as that term is defined pursuant to the Employee Retirement Income Security Act of 1974.  If at any time, the pension trust based on actuarial reports projects vested unfunded liability or in fact same occurs, this Article shall be deemed open for negotiation on all aspects of the pension issue at any time on written demand from the Employer.

| | |
|---|---|
| Effective September 19, 2018 | $1.31 |
| Effective September 19, 2019 | $1.34 |
| Effective September 19, 2020 | $1.38 |

The payments shall be made monthly and shall be due on the fifteenth (15th) day of each month, in arrears.  The payment shall be used by the Pension Plan to provide benefits for eligible

20

employees in accordance with the Pension Plan, or may be determined by the Trustees thereof, to be applied to the eligible employees based on the amount of Employer contribution.

The Employer hereby agrees to become a party to the said Agreement and Declaration of Trust, establishing the said Pension Plan and agrees to be bound by all the terms and provisions of the Pension Plan and designates as its representative such Trustees as are named in said Agreement and Declaration of Trust as Employer Trustees together with their successors selected in the manner provided in said Agreement.  A copy of said Agreement and Declaration of Trust is to be annexed to the Agreement upon the execution hereof.  If a current Employer Trustee resigns, the Employer shall have the right to apply to the Contributing Employers to become an Employer Trustee.

It is understood and agreed that the Pension Plan referred to herein shall qualify for approval by the Internal Revenue Bureau of the U.S. Treasury Department so as to allow the Employer an income tax deduction for the contributions paid herein.

For the purpose of this Article, all employees coming under the work classification covered by this Agreement shall be considered to be covered by the Agreement as of their first day of employment with the Employer.

The parties agree that except as may be otherwise provided herein, the Employer's obligation to the Pension Plan and to the employees covered thereby, shall be fulfilled at the time the Employer makes the contributions to the Pension Plan in the amount and the manner provided herein, and provided further that upon making contributions, the Employer shall be relieved and discharged from any further obligation to the Pension Plan.

Notwithstanding the foregoing, the obligation of the Employer hereby assumed shall continue only so long as there is in existence an effective Agreement between the Employer and the Union.

**ARTICLE 14**
**GRIEVANCE PROCEDURE**

This Article is designed to provide a mutually acceptable means of resolving grievances at the lowest level possible, and the Employer and the Union agree to work toward this end in good faith. The provisions of Section G herein shall not supersede this basic principle of working together in good faith, nor to strip the Arbitrator of authority to determine the application of Section G itself in accordance with prevailing law.

**SECTION A – GRIEVANCE DEFINED**

A grievance ("Grievance") exists when the Union or any member thereof (on behalf of any employee or group of employees), or the Employer, makes any claim that his, her or its rights have been violated with respect to the interpretation, meaning, operation or application of this Agreement.  For the avoidance of doubt, a Grievance includes any and all claims arising out of, or relating in any way to, this Agreement, including without limitation, any and all statutory claims between or involving the Employer and the Union or any member thereof which relate in any way to a Union member's employment by the Employer; all such Grievances which shall be subject to the procedures set forth in this Article 14, including without limitation the arbitration procedures

21

set forth in Section F below.  Every Grievance submitted pursuant to this Article must set forth, in writing, the following information:

1.     The date submitted;

2.     A description of the alleged violation in sufficient detail to identify the basis of the Grievance;

3.     Specific reference to the contractual provision(s) alleged to have been violated; and

4.     A statement of the remedy sought.

For the avoidance of doubt, neither the Employer nor the Union shall be required to recognize any oral grievance, or any grievance that does not meet the requirements set forth above, provided that notice of refusal to so recognize a grievance shall be given immediately and unequivocally.  The deficiency may be corrected within one (1) business day.  The Union or the Employer may waive the requirements of this Section A; provided, however, that any such waiver much be in writing, dated and signed by an authorized representative of the Union or the Employer, as the case may be.

## SECTION B – <u>STEP ONE</u>

In the case of a Union Grievance, the written Grievance must be submitted to the immediate supervisor of the aggrieved employee (or group of employees) within five (5) working days after the occurrence of the facts on which the Grievance is based.  In the case of an Employer Grievance, the Grievance must be submitted to a Union Shop Steward within five (5) working days after the occurrence of the facts on which the Grievance is based.  If a written Grievance is not presented within this time, then the Grievance shall be barred absolutely and have no legal effect, pursuant to Section G herein.

The immediate supervisor or Shop Steward, as the case may be, shall respond to the Grievance, in writing, within five (5) working days.  No response shall indicate that the Grievance has been denied.

## SECTION C – <u>STEP TWO</u>

If the Grievance is not resolved pursuant to Step One, the immediate supervisor, the Union Shop Steward, and the HR Representative shall meet to attempt to resolve the Grievance ("Step Two Meeting").  In the case of an individual employee grievant, he or she may also attend the Step Two Meeting, but shall not be required to do so.  In the event of an Employer Grievance, the Union President shall also attend the Step Two Meeting.

## SECTION D – <u>STEP THREE</u>

If the Grievance is not resolved following the Step Two Meeting, the participants of the Step Two Meeting shall meet with the Company Site Leader within five (5) working days following the conclusion of the Step Two Meeting to attempt to resolve the Grievance ("Step Three Meeting").

In the event the Grievance is not resolved at the Step Three Meeting, the Employer or Union, as the case may be, shall provide its final position with respect to the Grievance, in writing, within five (5) working days.  This writing constitutes the Union's or Employer's, as the case may be, last answer to the Grievance.

## SECTION E – <u>STEP FOUR</u>

If the Grievance remains unsettled, an effort shall be made to resolve the dispute with the assistance of a mediator, who will be the current FMCS Commissioner, his or her designee, or any other mediator agreed upon by the Union and the Employer.  The request for mediation shall be made to the Employer or the Union, as the case may be, in writing, no later than ten (10) working days after the receipt of the Step Three response.

## SECTION F – <u>ARBITRATION – STEP FIVE</u>

If the Grievance is not settled pursuant to Step Four, the Union or the Employer, as the case may be, may institute arbitration by filing with the American Arbitration Association (AAA) (with a copy to the other side) no later than thirty (30) calendar days after the completion of Step Four. Where a Grievance is not pursued in arbitration within thirty (30) calendar days of the completion of Step Four, it shall be deemed fully and finally resolved on the bases set forth in the Employer's or Union's last answer, as the case may be, and the Grievance shall have no future legal affect, and an arbitrator shall have no authority whatsoever to hear or decide such Grievance.

Any arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, 201-208, 301-301.  Any and all Grievances and all issues arising from or relating thereto, including the interpretation and application of this section, shall be governed by, construed in accordance with and processed pursuant to AAA's then existing rules governing labor disputes, which rules are fully incorporated herein.  Expenses for the arbitration will be apportioned equally between the parties.  Any expense for a witness will be paid by the party calling the witness.  The Employer will not pay for any Union employee participating in the arbitration.  The procedure for the selection of an arbitrator will be as follows:

1. The party filing for arbitration will request a panel containing the names of ten (10) arbitrators, all of whom must be members of the National Academy of Arbitrators, and enclose a copy of this Article.

2. The parties will respectively strike the names on such panel that are unacceptable and list, in order of preference, the names that are acceptable.

3. Within ten (10) days of the receipt of such panel, the parties will respectively file such document with the AAA in accordance with applicable filing requirements.  They will administratively determine if there is a mutually-agreeable arbitrator, and if so, notify the parties and the arbitrator.

4. If the first panel does not produce a mutually agreeable arbitrator, then the AAA will submit a second panel containing ten (10) additional names.  The parties may strike no more than seven (7) proposed arbitrators on this second panel and must rank three (3) names that are acceptable in order of preference.

EAST\166710285.1

5. Within ten (10) days of the receipt of such second panel, the parties will respectively file such document with the AAA, who will administratively determine if there is a mutually agreeable arbitrator, and if so, notify the parties and the arbitrator.  If not, then the parties shall defer to AAA rules concerning the selection of arbitrators.

**SECTION G – <u>CONSEQUENCES OF FAILING TO ADHERE TO THE GRIEVANCE PROCEDURES</u>**

If a proper written Grievance is not presented, or arbitration not instituted, within the strict time limits specified in this Article, then the Grievance is barred absolutely, shall have no legal effect, and no arbitrator shall have the authority to exercise jurisdiction over, or make any determination regarding, any such Grievance,

**SECTION H – <u>LIMITATION ON AUTHORITY OF ARBITRATORS</u>**

It is expressly understood that no Grievance on an issue of "just cause" for discipline, will be construed as being in any way criminal in nature and that the Employer's burden of proof in the arbitration of such Grievance will be by a fair preponderance of the credible evidence, and any arbitrator selected by the Employer and the Union must adhere to this standard of proof.

Any arbitrator appointed will have no authority to (a) add to, subtract from, or in any way modify the provisions of this Agreement; (b) limit or change any Employer's policy, practice or rule not stated in this Agreement; (c) interpret any such policy, practice or rule except as necessary in interpreting or applying this Agreement; (d) formulate or add any new policy or rule.

**SECTION I – <u>RIGHT OF REPRESENTATION AND/OR COUNSEL FOR PARTIES ONLY</u>**

The Employer and the Union are the only parties to this Agreement and they and only they have the right to representation and/or counsel with respect to any and all matters, direct or indirect, having to do with grievances on issues under this Agreement.  No grievant will be represented by anyone who is not an official representative of and/or counsel for the Union, as certified to by the Union to the Employer prior to the occurrence giving rise to the grievance, or as known to the Employer prior to such time and in the ordinary course of business between the parties.

It is the intention of the parties hereto that under no circumstances will the Employer be required to deal with anyone on behalf of a grievant other than persons described in the first paragraph of this Section and that no one will be allowed to attend or observe any conference on such a grievance other than representatives of the Employer and persons described in the first paragraph of this Section and that other than the Arbitrator and Court Reporter, no one will be allowed to attend or observe any arbitration proceedings other than representatives of the Employer and persons described in the first paragraph of this Section.

In the event that this Section is violated in any way, directly or indirectly, then the grievance will be forfeited and barred absolutely and evidence of such forfeiture can be used by the Employer in a civil action to stay any arbitration on such grievance and provided that in the event the Employer is unsuccessful in such grievance and provided that in the event the Employer is unsuccessful in such civil action then any arbitrator selected to hear such grievance will be bound to render an

award denying such grievance by reason of such forfeiture, if such arbitrator finds that this Section has been violated in any way, directly or indirectly.

It is not the intention of the parties hereto to deprive any grievant of the right to be individually represented by private counsel as to any alleged right, only that any such alleged right must be pursued in a forum other than under this Article.

**ARTICLE 15**
**PROHIBITION AGAINST STRIKE, SLOW-DOWN,**
**INTERRUPTION OF BUSINESS AND LOCK-OUT**

**SECTION A – <u>STRIKE DEFINED</u>**

For purposes of this Agreement, and any interpretation thereof, a strike is defined as any concerted refusal to perform assigned work; any concerted slow-down in the performance of assigned work; any concerted interruption of work at the Employer's premises at any hour; any concerted picketing or handbilling of Employer's premises at any hour, which is against the Employer's business; any concerted boycott activity against the Employer's business, any other concerted activity, the object of which is to cause economic harm to the Employer. Moreover, it is expressly understood that included in this definition of strike is 1) any of the above described actions, the object of which is to protest any action by the Union and/or its parent organization; 2) any of the above described actions, the object of which is to protest any action by any party not a signatory to this Agreement, and 3) any of the above described actions, the object of which is to support or be in sympathy with another organization, including another labor organization.

Further, it is expressly understood, that by reason of the ratification of this Agreement, the individual employees acknowledge the waiver of their right to strike as herein defined.

The Union and the Employer expressly agree that any grievance arising under this Article is subject to arbitration.

**SECTION B – <u>PROHIBITION AGAINST STRIKE</u>**

The Union shall not, nor shall any employees by concerted action cause, engage in or participate, either directly or indirectly in any strike activity as defined by Section A of this Article during the term of this Agreement.

**SECTION C – <u>LOCK-OUT DEFINED</u>**

For purposes of this Agreement, and any interpretation thereof, a lock-out is defined as the barring of the employees in the bargaining unit from the performance of bargaining unit work, as the exercise by the Employer of an economic weapon for the purpose of furthering some objective in collective bargaining or in contract administration.

Under no circumstances, is the Employer's exercise of the Management right to reduce the work force, to be construed as a lock-out provided that the Employer offers substantial evidence that such force reduction was the result of a reduction in the quantity of bargaining unit work, which reduction was lawfully permitted under the terms of this Agreement.

25

**SECTION D –** <u>PROHIBITION AGAINST LOCK-OUT</u>

The employer shall not, during the term of this Agreement, engage in any lock-out, as defined by Section C of this Article.

## ARTICLE 16
## GENERAL PROVISIONS

**SECTION A –** <u>JURY DUTY</u>

An employee subpoenaed and reporting for jury duty shall be paid the difference between the amount the employee would have earned by working his regular scheduled hours provided first: that the employee notifies his supervisor of the subpoena, and second: that the employee presents to the Employer appropriate evidence from the court as to his period of service and compensation.

In the event an employee on the 4th and 5th shift is subpoenaed and reports for jury duty during his weekend shift, the provisions outlined in the above paragraph shall apply.

**SECTION B –** <u>LEAVE OF ABSENCE</u>

The Employer agrees to provide employees with leaves of absence in accordance with applicable federal and state law.  In the event of a short-term disability leave, as referenced in Article 16, Section O herein, such coverage shall be provided consistent with the Employer's disability insurance policy.

**SECTION C –** <u>LEAVE OF ABSENCE – MILITARY SERVICE</u>

Upon the employee's application and presentation of proof of orders to report for encampment or naval duty, the Employer agrees to grant a leave of absence, without pay, deemed to be two (2) weeks or a time necessary, for training cruises or encampment for those employees who are members of the enlisted reserve corps, the Naval militia, the Coast Guard reserve and the National Guard of the United States.
Any employee who enters the full time military service will be granted a leave of absence pursuant to the Vietnam Era Veteran's Readjustment Assistance Act of 1974, as amended.

**SECTION D –** <u>PROHIBITION OF EMPLOYMENT DURING LEAVE</u>

Any employee granted a leave of absence and who engages in other employment during a leave of absence shall be subject to immediate dismissal.

**SECTION E –** <u>BEREAVEMENT PAY</u>

In the event of death in the immediate family of an employee who has completed their probationary period, the Company shall pay the employee for the period so lost during such time, but not to exceed three (3) days, inclusive of the day of rest at a rate of eight (8) times the straight time hourly wage rate in effect for each bereavement day taken.  The immediate family means only parents, spouse, children, brothers, sisters, current mother-in-law, current father-in-law and grandparents of the employee.

Employees assigned to the 4th and 5th shifts shall be paid the equivalent hours of pay for the period of bereavement outlined in the above paragraph.  Therefore, employees on these shifts shall be paid for two (2) twelve-hour (12 hour) days on the weekend shift.

**SECTION F –** SAFETY COMMITTEE, SAFETY EQUIPMENT AND SANCTIONS

1.      The Company will provide all employees with safety glasses, equipment and uniforms at no cost to employees, subject to the Employer's rules and regulations as to their use and care..

2.      The Employer and the Union will establish a Joint Safety and Health Committee to meet and recommend appropriate programs, procedures and policies to insure compliance with applicable safety regulations and to provide safe working conditions.  The Committee shall consist of at least five (5) members from the Employer and five (5) members to be appointed by the Union which may include a Union representative, and the Chief Steward. The Committee shall meet at least once a month and shall attend, where necessary, safety meetings called by the Employer, and shall make such recommendations as the Committee deems advisable.   The Employer will alternate the monthly meeting schedule to accommodate 2nd and 3rd shift Union participants who shall be paid for attending such meetings.

3.      Supervisors shall be directed to promote safe working habits and to instruct employees in the use of protective equipment, and insure such equipment is utilized where mandated by safe practice or law.  Protective equipment includes, but is not limited to hard hats, safety glasses, safety shoes and proper clothing.  The Employer will endeavor to issue three (3) sets of uniforms, five (5) T-shirts and safety shoes during the month of March each year. Employees will be required to wear same in the workplace, and employees shall maintain and properly care for such uniforms and shirts.

4.      Safety equipment required and provided by the Employer shall be worn by all employees. If any employee refuses to wear the required safety protective equipment, he will be subject to disciplinary action up to and including discharge.

5.      Once per year, the Company will pay up to ninety dollars ($90) for the purchase of safety shoes where required in the Plant, and will use reasonable good faith efforts to provide same to eligible employees in or around March.

**SECTION G –** EXCLUSIVE RECOURSE TO AGREEMENT

Except for resort to the agencies and/or courts charged with the enforcement of the laws enumerated in Article 1 herein, and except further for resort to the National Labor Relations Board, it is the intention of the parties that employees will look exclusively to this Agreement for the resolution of all disputes arising under this Agreement.

This Agreement represents a settlement of all issues after extensive collective bargaining between the parties, including but not limited to, the "Vacation Hours" grievance with respect to Article 8, Section A, with prejudice.  Neither party shall be obligated to bargain upon any subject, whether or not the same was mentioned and/or discussed during the course of said collective bargaining,

prior to the period contemplated by Section 8(d) of the National Labor Relations Act at the end of this Agreement.  Unless otherwise expressly incorporated herein, all prior agreements, memoranda of understanding are declared null and void and of no future effect.

**SECTION H –** <u>CHECK-OFF OF EMPLOYEE DEPOSITS TO FEDERAL CREDIT UNION</u>

The Employer and the Union will agree to a checkoff of wages for deposit to a federally insured Credit Union, subject to the agreement of the attorney for the Employer, the attorney for the Union and the attorney for the Credit Union.

**SECTION I –** <u>ATTENDANCE AWARD PROGRAM</u>

The Employer will award $200, paid by check, to any employee who has a perfect attendance record during the calendar year and receives the full eight (8) days as his annual sick pay payback.

Employee will not be disqualified from eligibility for the attendance award because they have been paid for days off for vacation, jury duty, bereavement and holidays as outlined in this agreement.

An employee who uses up to two (2) days of sick pay during the calendar year in conjunction with a death in the immediate family (as defined in Article 16, Section E) will not be disqualified from receiving an attendance award provided the employee has a perfect attendance record during the calendar year and receives six (6) days of his annual sick pay payback.

**SECTION J –** <u>REQUEST FOR TRANSFER</u>

In the event an employee requests a transfer from one shift to another, the Employer will make a reasonable attempt to accommodate such request, subject to production requirements and running an efficient operation.

Upon transfer to another shift, employees will not be able to request another transfer for at least six (6) months.  The Employer will provide the Shop Chairperson with a copy of the list of transfer requests on a quarterly basis.

**SECTION K –** <u>EMPLOYEE RECORDS</u>

It will be the employee's responsibility to notify the Personnel Department, in writing, of a change in residence or mailing address, and other necessary information in keeping records current.  In March and September, the Employer will distribute a copy of this Section with the pay envelope of every employee.

**SECTION L –** <u>EDUCATIONAL REFUND ASSISTANCE PROGRAM</u>

The Employer will provide an Educational Assistance Program for full-time, non-probationary employees, with at least one (1) year of continuous service in the Bargaining Unit.  Employees will be eligible to take courses that are related to the employees current, or reasonably anticipated future work assignments.  Eligibility and reimbursement of this program will be covered under CNY Human Resource Policy for Educational Refund Assistance Program for Union employees.

**SECTION M – <u>TERM LIFE INSURANCE</u>**

1.  The Employer will continue to provide term life insurance coverage for employees. The benefit will be based on the calculation of employee's hourly rate of pay, including merit increase and/or Leadman pay, times 2080 hours per year, minus $3,000. Employees will be responsible to maintain updated beneficiary information.

2.  Employees may elect to purchase Optional Term Life insurance coverage in multiples of their base annual earnings. Employees may chose 1, 2, 3, 4, or 5 times of their base annual earnings up to a $1 million maximum. Employees have 31 days from their eligibility date to elect coverage up to three (3) times their base annual earnings without providing evidence of good health.

The Company reserves the right to amend, modify or delete the Optional Term Life Insurance and to establish applicable rates for Optional Term Life Insurance, provided that all such changes and rates will be applied equally to non-represented employees.

**SECTION N – <u>TRAINING</u>**

Notwithstanding any of the provisions of this agreement, where the Employer has made a decision to undertake to train an employee, and said training is for a higher classified position on a regularly assigned basis, the Employer will assign employees on the following basis:

- Any employee who, during the first three working days in February, renewable each year, has made a request for training in a specific department, is qualified and is the most senior of those making the request.

Nothing herein will be interpreted to restrict the Employer's ability to assign employees temporarily to address production and scheduling requirements of the Employer.

**SECTION O – <u>SHORT TERM DISABILITY</u>**

The Employer will provide Short Term Disability coverage for a period up to 26 weeks up to $300 per week.

**<u>ARTICLE 17</u>**
**<u>ALCOHOL/DRUG/SUBSTANCE ABUSE</u>**

The Company and the Union have a continuing concern for the safety and health of all employees at the Orangeburg plant. Similarly the parties agree that the use, being under the influence, the sale, manufacture, possession, distribution of controlled substances and/or alcohol constitutes a threat to the safety of employees and the integrity of our work product. Notwithstanding Union and individual employee reservations on the subject of mandatory drug testing, the Union nevertheless recognizes the Employer is required to implement and maintain an Anti-Drug Program in order to maintain its FAA repair certification. To that end, the Union agrees that the Anti-Drug Plan, filed by the Employer with the FAA, dated July 1,1990, and as amended by the FAA, under FAA repair certificate number JM1R249K, shall be the Drug Plan Program to be

29

implemented.  The parties further agree that the provision of the FAA mandated Alcohol Misuse Prevention Program shall be implemented.

It is the intent of the Employer and the Union, to continue to encourage any employee with an alcohol, drug or substance dependency problem, to seek professional help or assistance before the problem affecting their job leads to an incident requiring disciplinary action.  An employee who seeks assistance for an abuse problem, voluntarily, will be referred for treatment.

## ARTICLE 18
## EFFECT OF TERMINATION

Immediately upon the expiration of the term of this Agreement, the provisions of this Agreement will automatically be null and void, except that any grievances filed before such expiration date will continue to be administered as if such Collective Bargaining Agreement were still in effect.

## ARTICLE 19
## SEVERABILITY

**IF ANY PROVISION OF THIS AGREEMENT IS HELD INVALID BY A COURT, ADMINISTRATIVE AGENCY OR OTHER ADJUDICATORY BODY OF COMPETENT JURISDICTION OR IS RENDERED INVALID BY OPERATION OF FEDERAL OR STATE STATUTE, LOCAL ORDINANCE OR OTHER APPLICABLE GOVERNMENT REGULATION OR RULE, SUCH PROVISION SHALL BE TREATED FOR ALL PURPOSES AS NULL AND VOID/CONTINUE IN EFFECT ONLY TO THE EXTENT PERMITTED BY LAW.  THE REMAINDER OF THE AGREEMENT, INCLUDING THE AGREEMENT'S PROHIBITION ON STRIKES AND LOCKOUTS, SHALL CONTINUE IN FULL FORCE AND EFFECT.**

## ARTICLE 20
## DURATION

This Agreement is effective at 12:01 AM on the 19th day of September, 2018 and shall remain in effect until 11:59 PM on the 18th day of September, 2021.

CHROMALLOY NEW YORK

STEVE SHIFFMAN

LOCAL 475 IUE-CWA

PETER K. VAUPEL
PRESIDENT
LOCAL 475 IUE-CWA

EDUARDO MELENDEZ
SECRETARY TREASURER
LOCAL 475 IUE-CWA

LOCAL 475 NEGOTIATING COMMITTEE

EAST\166710285.1

## APPENDIX
## PRODUCTION AND MAINTENANCE UNIT

The job classifications and the corresponding hourly rates shall be in accordance with the following schedule:

| CLASSIFICATION | 9/19/2018 | 9/19/2019 | 9/19/2020 |
|---|---|---|---|
| PRODUCTION WORKER | 21.77 | 22.31 | 22.98 |
| PEENING MACHINE OPERATOR | 22.20 | 22.76 | 23.44 |
| POWDER BLENDER | 22.20 | 22.76 | 23.44 |
| ACID MIX & STRIP | 22.64 | 23.21 | 23.91 |
| SHIPPING & RECEIVING CLERK | 22.97 | 23.54 | 24.25 |
| MAINTENANCE HELPER | 23.12 | 23.70 | 24.41 |
| PLASMA OPERATOR | 23.12 | 23.70 | 24.41 |
| OVERLAY SUPPORT | 23.12 | 23.70 | 24.41 |
| DIE/PRESS OPERATOR | 23.75 | 24.34 | 25.07 |
| BLENDER | 23.83 | 24.43 | 25.16 |
| POST COAT OPERATOR | 23.83 | 24.43 | 25.16 |
| EDM OPERATOR | 23.85 | 24.45 | 25.18 |
| MAINTENANCE "B" | 23.95 | 24.58 | 25.32 |
| LASER OPERATOR | 24.43 | 25.04 | 25.79 |
| LASER POWDER WELDER | 24.43 | 25.04 | 25.79 |
| COAT & HEAT TREAT SPECIALIST | 24.59 | 25.20 | 25.96 |
| ELECTROPLATER | 24.59 | 25.20 | 25.96 |
| HYDROGEN HEAT TREAT SPECIALIST | 25.12 | 25.75 | 26.52 |
| HELL ARC WELDER | 25.46 | 26.10 | 26.88 |
| L H PANEL OPERATOR | 25.47 | 26.11 | 26.89 |
| PLASMA OPERATOR & SET-UP | 25.47 | 26.11 | 26.69 |
| EDM OPERATOR & SET-UP | 25.47 | 26.11 | 26.89 |
| MAINTENANCE "A" | 26.01 | 26.66 | 27.46 |
| HF AUTOCLAVE OPERATOR | 26.08 | 26.73 | 27.53 |
| COATER MAINTENANCE | 26.08 | 26.73 | 27.53 |
| MAINTENANCE SPECIALIST | 26.08 | 26.73 | 27.53 |
| MACHINIST | 26.99 | 27.66 | 28.49 |
| EQUIPMENT MAINT. SPECIALIST | 28.54 | 29.25 | 30.13 |
| CNC MACHINIST | 28.83 | 29.55 | 30.44 |
| TOOL & DIEMAKER | 29.89 | 30.64 | 31.56 |
| TOOL & DIEMAKER CLASS "A" | 32.54 | 33.35 | 34.35 |

32

## APPENDIX

Original Date: September 17,1990
Reissue Date: January 1, 2013

**EDUCATIONAL REFUND ASSISTANCE PROGRAM - UNION EMPLOYEES**

I.    POLICY STATEMENT

The development and continuous improvement of employee's skills and knowledge are essential to the progressive development and profitable operation of Chromalloy New York.  It is the policy of CNY to encourage employees to increase their skills and knowledge as it relates to the effectiveness and performance of their current assignments.

Therefore, an Educational Refund Assistance Program will be offered to qualified eligible employees who wish to prepare themselves for the challenges and increasing responsibilities of our technologically changing environment.  In offering this plan, it is not the intent to guarantee a promotion, a change of assignment or a salary increase.  It is the intent of this plan to provide assistance to employees where additional education will benefit the employee, and CNY, in meeting the Division's challenges of the future.

II.    PURPOSE

Under this plan, financial assistance will be provided for qualified employees, with at least one year of continuous service, who enroll in courses which fall within the following parameters:

Plan I - Professional/Technical/Vocational Courses

Employees who voluntarily enroll in approved professional and technical courses, outside normal working hours, which are job related.  For example:  Six Sigma certification.  The course must be an accredited course qualified for continuing education units (C.E.U.) and given by an accredited institution of higher education.

Plan II - College Degree Refund Program

Employees who voluntarily enroll in an accredited junior community college, four year college or university or graduate school, in the pursuit of a course of study leading toward an associate or bachelor degree, outside of normal working hours.

Plan III - Self-improvement/Development Courses

Employee who voluntarily enroll in courses that enable them to develop their own basic skills, such as "English as a second language", preparation for Graduate Equivalency Diploma (G.E.D.), outside normal working hours, which are reasonably job related.  The courses must be taken at a certified institution of learning.

33

EDUCATION REFUND ASSISTANCE WILL ONLY APPLY TO EMPLOYEES PURSUING COURSES THAT ARE RELATED TO THE EMPLOYEES CURRENT JOB, OR TO A POSITION IN THE COMPANY THAT HE/SHE COULD REASONABLY ASPIRE.

The institution selected must be an approved junior, community college, four year college, university, or graduate school which has received regional or national accreditation's from an approving agency.

The criteria for course eligibility shall include the following:

A.   The course must carry full credit toward either an associate or bachelors degree.

B.   The course must be related to the employee's current job, or one to which he/she can reasonably aspire.

C.   Reimbursement for courses undertaken at the undergraduate and graduate level will be limited to those courses, which are job related and/or courses needed by reason of a job-related degree.

D.   CNY reserves the right to determine whether or not a course(s) qualifies for this program.

Tuition refund payments are made only to active, full-time employees.  Individuals must be in the employ of CNY at the beginning and end of courses taken.

III.   PROCEDURE

Prior to enrollment in the course, the employee must submit a completed Educational Refund Assistance application form (attached) and have the application approved by the Human Resources Department.  The catalog or descriptive material regarding the course must be attached to the application, along with a Bursars Receipt or other form of evidence regarding the tuition cost.  Applications for Education Refund Assistance must be submitted at least two (2) weeks prior to the beginning of the semester, or at the time of registration.  Employees will be notified, in writing, whether their application has been approved or denied.

IV.   REFUNDS

The refund shall be granted only for successful completion of the course(s) with a grade "C" or better, Satisfactory or pass, in those instances where grades are not given, will be acceptable. Refunds shall be for registration fee and tuition only.  Cost for books and general fees will not be considered for refund.  The maximum tuition refund that will be granted to any employee has been increased to $5,000 per school year commencing January 1, 2013.

V.   METHOD OF REFUND PAYMENT

Upon the completion of the designated course, a grade report or statement of successful and satisfactory completion must be presented to the Personnel Department, which will

34

become a permanent part of the employee's personnel file.  Chromalloy will reimburse the employee by check, based on the schedule below, for the tuition cost for those courses, which were approved and successfully completed.  Reimbursement will be based on the following schedule subject to the maximum yearly allowance:

| Course Grade | | Amount Refunded |
|---|---|---|
| "A" | | 100% |
| "B" | < | 100% |
| "C" | < | 100% |
| Below "C" | | 0% |
| Pass/Fail | | Pass 100% |
| | | Fail 0% |

VI.    <u>OUTSIDE FINANCIAL AID</u>

Employees who are eligible for educational aid from the Veteran's Administration or from some scholarship program must first exhaust these benefits before they are eligible for Education Refund.  If outside aid does not fully cover the cost of tuition, the employee may receive payment under the CNY policy to cover the difference between the maximum to which he is entitled each school year under this policy, and the amount of the other assistance during the same period.

EAST\166710285.1

# 2018   2019   2020   2021

EAST\166710285.1